IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Sep 30, 2025

IN RE:

HARRY MONROE ASHWOOD, V, and
STACIE MARIE ASHWOOD

Debtors.

Case No. 24-11378-T
Chapter 7

## MEMORANDUM OPINION

This matter comes before the Court pursuant to the Trustee's Objection to Debtors' Claim of Homestead Exemption ("Trustee's Objection")[1] filed by Steven Soulé, the Chapter 7 Trustee ("Trustee"); the Response[2] to Trustee's Objection filed by Harry and Stacie Ashwood ("Mr. and Mrs. Ashwood," respectively, or collectively the "Debtors"); and the Debtor's [sic] Brief in Support of Response[3] to Trustee's Objection filed by Debtors. The Court held a hearing on June 10, 2025, wherein evidence was taken and argument was heard (the "Hearing"). The matter was taken under advisement, and the Court is now ready to rule. For the reasons stated below, Trustee's Objection is overruled. The following findings and conclusions are made pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.

## Jurisdiction

The Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. § 1334(b).[4] Venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of the bankruptcy case is proper pursuant to 28 U.S.C. § 157(a). This matter is a core proceeding pursuant to 28 U.S.C.

---

[1] ECF No. 24.
[2] ECF No. 32.
[3] ECF No. 39.
[4] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

1

§ 157(b)(2)(B).

## Findings of Fact

Debtors are husband and wife. They have four children, aged between 3 and 17, who live with them.[5] Mrs. Ashwood holds an associate's degree in education and is currently working as an administrative assistant. In Spring 2024, Debtors were insolvent, struggling financially, and being pursued by several creditors. Sometime in April, Debtors contacted local bankruptcy counsel to discuss filing bankruptcy or other debt consolidation options. After becoming aware of Debtors' financial condition, Mrs. Ashwood's great-uncle, William Goodall ("Goodall") offered to help Mrs. Ashwood purchase a house in Claremore, Oklahoma. From their messaging history, the terms of the "offer of help" were never clear, but it seemed to evolve from helping her secure a loan, to helping finance a downpayment, to providing the entire purchase price of the home. Goodall made inquiries with his bank, but found he was unable to purchase the property outright. Still determined to help, Goodall decided to send funds directly to Mrs. Ashwood so that she could purchase the house in her own name.

To that end, Goodall initiated a wire transfer of $204,200 on April 19, 2024, to a savings account held in Mrs. Ashwood's name that she maintained at Chase Bank (the "Chase Account").[6] Mrs. Ashwood testified that $200,000 was to be used for the home purchase, and the additional $4,200 was for the purpose of paying off a car loan.[7] The memo line of the wire transfer states its purpose was to "Help FamiLy [sic] Member Purchase A House."[8] Three days later, in order to cover the costs of an increased offer for the Claremore home, Goodall wired an additional $5,000

---

[5] ECF No. 1, at 34 (Schedule J).

[6] Trustee's Ex. 9-32.

[7] Mrs. Ashwood also testified that she never used the additional $4,200 to pay off the car loan, even though she told Goodall that she had used it for that purpose.

[8] *Id*.

to Mrs. Ashwood.[9] These two deposits, totaling $209,200, are hereinafter referred to as the "Goodall Funds." Shortly thereafter, Mrs. Ashwood's offer to purchase the Claremore home was accepted. On May 9, 2024, Mrs. Ashwood transferred $203,520.28 (the "Homestead Funds") to Titan Title & Closing, LLC ("Titan") to effectuate the purchase of her new home (the "Homestead").[10]

Mrs. Ashwood testified that, in the end, the Goodall Funds were intended to be a gift and not a loan. Text messages between Goodall and Mrs. Ashwood suggest that Goodall reported the transaction as an interest-free loan to the IRS. There was no indication from their text conversations that Goodall ever expected repayment from Mrs. Ashwood, although the messages make clear that he was concerned they would both be subject to gift taxes if the IRS treated the transaction as a gift. Trustee testified that he did not believe the transaction was a gift; instead, he suspected it was a loan. Trustee presented no argument, and the Court will not speculate, how the gift/loan distinction might affect the outcome of this case. Finding the distinction not relevant, and the lack of any convincing evidence to the contrary, the Court will accept Mrs. Ashwood's characterization of the Goodall Funds as a gift.

The Chase Account was opened by Mrs. Ashwood sometime prior to December 2022. Prior to the purchase of the Homestead, it was used for the exclusive purpose of reserving Debtors' monthly rent payments. Following the purchase of the Homestead, Mrs. Ashwood ceased using the Chase Account.[11] In September 2024, the Chase Account was closed by Chase Bank due to disuse.

During Spring 2024, while the purchase of the Homestead was unfolding, Debtors were

---

[9] Trustee's Exs. 7-14, 9-32.
[10] Trustee's Exs. 9-34, 8-1.
[11] Trustee's Ex. 9-34 to -39.

being pursued by two of their creditors. On January 10, 2024, a journal entry of default judgment was entered against both Debtors in the District Court of Tulsa County in favor of Credit Acceptance Corporation in the amount of $10,834.52, plus attorney fees and interest.[12] It is unclear if Debtors received notice of the entry of default. Mrs. Ashwood testified that she did not recall receiving notice of the judgment and noted that the address listed on the certificate of mailing contained a typographical error. The Court further notes that the certificate of mailing is dated December 20, 2023, some three weeks before the judgment was entered. In March 2024, Credit Acceptance Corporation filed a garnishment affidavit against Mr. Ashwood.[13] Though Mrs. Ashwood testified that Debtors' checks had been garnished, she couldn't recall when those garnishments began. She also testified that the garnishment affidavit filed by Credit Acceptance Corporation was directed towards Waffle House, and neither of the Debtors were employed by Waffle House at that time.  During this same period, a second collection action was pending against Mrs. Ashwood, this one by Discover Bank in the amount of $2,854.61.[14] A journal entry of default judgment in favor of Discover Bank was entered May 9, 2024.[15]

After purchasing the Homestead, Debtors believed they would be able to catch up on their financial obligations and avoid bankruptcy since they were no longer making monthly rent payments for housing. After several months, finding their circumstances had not substantially improved, Debtors once again began considering bankruptcy relief. Debtors expressed concern to their bankruptcy counsel that their receipt of the house as a gift would preclude such relief.[16] The

---

[12] Trustee's Ex. 1.

[13] Trustee's Ex. 4.

[14] Trustee's Ex. 3.

[15] Trustee's Ex. 11.

[16] *See* Trustee's Ex. 7-27 (**Mr. Ashwood**: ". . . I do have one question. So Stacey's aunt and uncle bought us a house so know [sic] we are home owners. Can we still file with owning a house or how douse [sic] that work?").

response from counsel was both reassuring and unequivocal: "You can still file it doesn't really change anything any equity you have in the house is exempt from being liquidated."[17] With this assurance, Debtors filed their voluntary petition for relief under chapter 7 on October 11, 2024 (the "Petition Date").

In their petition, Debtors scheduled their interest in the Homestead and claimed it exempt under Oklahoma law.[18] They noted in Schedule C that they claimed a homestead exemption in excess of $189,050, and that they acquired the property covered by the exemption within 1,215 days before the Petition Date.[19]   Debtors answered "No" to Questions 5 and 18 of the Statement of Financial Affairs ("SOFA"), which inquired whether they had received income or transferred property within 2 years prior to the Petition Date.[20]   Debtors also responded "No" to SOFA Question 20, which asked if they had closed any financial accounts within one year before the Petition Date.[21]

---

[17] *Id.*

[18] Defendant's Ex. 101, at 10 (Schedule A); *Id*. at 16 (Schedule C).

[19] *Id*. at 17 (Schedule C).

[20] SOFA Question 5 reads:
**Did you receive any other income during this year or the two previous calendar years?** Include income regardless of whether that income is taxable. Examples of other income are alimony; child support; Social Security, unemployment, and other public benefit payments; pensions; rental income; interest; dividends; money collected from lawsuits; royalties; and gambling and lottery winnings.

SOFA Question 18 reads:
**Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?** Include both outright transfers and transfers made as security (such as the granting of a security interest or mortgage on your property). Do not include gifts and transfers that you have already listed on this statement.
*Id*. at 38 (SOFA Question 5); *Id.* at 41 (SOFA Question 18).

[21] *Id*. at 42 (SOFA Question 20).

During the § 341 meeting of creditors (the "Meeting of Creditors"), Trustee inquired about the Debtors' acquisition of the Homestead.  Trustee did not provide the Court with a transcript of the Meeting of Creditors, but he played a portion of the recording at the Hearing. In response to a question from Trustee at the Meeting of Creditors about how they obtained their interest in the Homestead, Debtors initially responded that it was a gift from Goodall. Upon review of the deed, Trustee noted that it appeared the Homestead was not transferred from Goodall, but directly from a third-party seller to Mrs. Ashwood.  Mrs. Ashwood then clarified that Goodall had gifted her the funds to purchase the Homestead, which she held in her account for a short time before transferring them to Titan to complete the purchase.

At the Hearing, Mrs. Ashwood testified that she believed the Debtors had properly disclosed their interest in the Homestead in their schedules, and she did not believe there was anything missing from the schedules or SOFA. Specifically, Mrs. Ashwood testified that she did not understand that the use of the Homestead Funds to purchase the Homestead was the type of transfer contemplated by SOFA Question 18. Debtors later amended their response to SOFA Question 18 to include the receipt of the Goodall Funds and the purchase of the Homestead, but they maintain their belief that neither of those transactions needed to be disclosed.[22] Regarding their response to SOFA Question 20, Mrs. Ashwood testified that Debtors had overlooked the Chase Account, primarily because it had been closed by the bank (not the Debtors) and had not been used for several months. Debtors also amended their SOFA to identify the closure of the Chase Account.

---

[22] Mrs. Ashwood was not questioned about the source of her understanding during her testimony.  Debtors do not specifically raise a defense based on advice of counsel.

## Burden of Proof

An exemption recognized under the Bankruptcy Code may only be reduced or impaired when a statute provides the grounds for such reduction or impairment.[23]  In a chapter 7 bankruptcy case, all exemption entitlements are determined as of the date the case is filed.[24] The burden of proof is upon Trustee to show by a preponderance of the evidence that a claim of exemption is invalid.[25] The Court of Appeals for the Tenth Circuit has recognized that "the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor."[26]

## Conclusions of Law

Trustee seeks to reduce Debtors' claim of homestead exemption, pursuant to § 522(*o*), in the amount of the Homestead Funds, and to be granted an equitable lien for that amount on the Homestead repayable by Debtors within three months. When considering whether to reduce a debtor's homestead exemption, courts in this Circuit must "start with the premise that 'the conversion of non-exempt to exempt property for the purpose of placing the property out of the reach of creditors, without more, will not deprive the debtor of the exemption to which he otherwise would be entitled.'"[27]  In 2005, Congress enacted the Bankruptcy Abuse Prevention and

---

[23] *Law v. Siegel*, 571 U.S. 415, 423-24 (2014) ("[Section] 522 does not give courts discretion to grant or withhold exemptions based on whatever considerations they deem appropriate. Rather, the statute exhaustively specifies the criteria that will render property exempt.").

[24] § 522(b)(3)(A); *In re Crow*, 987 F.3d 912, 921 (10th Cir. 2021) ("[A] debtor's right to an exemption is determined on the petition date." (citing *White v. Stump*, 266 U.S. 310, 313 (1924))); *In re Lampe*, 278 B.R. 205 (10th Cir. BAP 2002), *aff'd,* 331 F.3d 750 (10th Cir. 2003).

[25] *See* Fed. R. Bankr. P. 4003(c); *Jenkins v. Hodes (In re Hodes)*, 402 F.3d 1005, 1010 (10th Cir. 2005).

[26] *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997) (citing *In re Adlman*, 541 F.2d 999, 1003 (2d Cir. 1976)).

[27] *Marine Midland Bus. Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1076 (10th Cir. 1991) (quoting *Norwest Bank Neb., N.A. v. Tveten,* 848 F.2d 871, 873–74 (8th Cir. 1988)). *See also Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008); *In re Anderson*, 386 B.R. 315, 330 (Bankr. D. Kan. 2008), *aff'd sub nom. Parks v. Anderson*, 406 B.R. 79 (D. Kan. 2009);

Consumer Protection Act of 2005 ("BAPCPA") and added both § 522(*o*) and § 522(p) to close the

so-called "mansion loophole," wherein debtors would move substantial sums of assets into

homesteads in states, like Oklahoma, with generous, unlimited homestead exemption laws for the

purpose of shielding those assets from the bankruptcy estate.[28] Under § 522(p), a debtor is

prohibited from exempting "any amount of interest that was acquired by the debtor during the

1215-day period preceding the date of the filing of the petition that exceeds in the aggregate

[$189,050] in value."[29] Section 522(p) permits a debtor to transfer funds from a non-exempt asset

into homestead equity during the 1,215-day period so long as it does not exceed the statutory cap.[30]

"The gravamen of § 522(p)(1) is to limit the ability of individuals desiring to take advantage of

---

*In re Agnew*, 355 B.R. 276, 283-84 (Bankr. D. Kan. 2006); *Holley Performance Prods., Inc. v. Coppaken (In re Coppaken)*, 572 B.R. 284, 304 (Bankr. D. Kan. 2017) ("But a debtor's conversion of non-exempt property to exempt property prior to filing bankruptcy 'for the express purpose of placing that property beyond the reach of creditors' is not enough to deprive a debtor of an exemption; there must be 'some facts or circumstances which are *extrinsic* to the mere facts of conversion of non-exempt assets into exempt [assets] and which are indicative of such fraudulent purpose.'" quoting *Addison v. Seaver (In re Addison)*, 540 F.3d 805, 814 (8th Cir. 2008)).

[28] *Soulé v. Willcut (In re Willcut)*, 472 B.R. 88, 94 (10th Cir. BAP 2012).

[29] § 522(p). On the Petition Date, § 522(p) read:

(p)(1) Except as provided in paragraph (2) of this subsection and sections 544 and 548, as a result of electing under subsection (b)(3)(A) to exempt property under State or local law, a debtor may not exempt any amount of interest that was acquired by the debtor during the 1215-day period preceding the date of the filing of the petition that exceeds in the aggregate $189,050 [originally "$125,000", adjusted effective April 1, 2022] in value in--. . . .(D) real or personal property that the debtor or dependent of the debtor claims as a homestead.

§ 522(p). The exemption amount has since been adjusted but does not apply to this case. *See* § 104.

[30] *See In re Presto*, 376 B.R. 554, 582 (Bankr. S.D. Tex. 2007) (Noting that "Debtor has an absolute right under § 522(p)(1) to exempt the first $125,000.00 that he acquired in his homestead during the 1215-day period[.]"); *In re Rasmussen*, 349 B.R. 747, 752–53 (Bankr. M.D. Fla. 2006) ("Turning then to the terms of section 522(p)—as an initial observation, it is clear that a debtor's intent to shield property from creditors is not a factor. In fact, in light of section 522(*o*), which deals with such intent, section 522(p) is not designed to deal with fraudulent conversions of property at all. It is simply a cap to be applied in cases in which a debtor happens to have acquired an interest in a homestead within the three years and four months prior to filing bankruptcy."). Other limitations on such exemptions found in § 522(q) are not applicable to this case.

the lenient exemption provisions of 'debtor-friendly' states by relocating to such states."[31] Neighboring § 522(*o*)(4) provides that the value of a homestead exemption must be reduced to the extent it was acquired through the conversion of non-exempt property within 10 years of the petition date, if the conversion was made "*with the intent to hinder, delay, or defraud a creditor*."[32] Where there is fraud, the remedy is found in § 522(*o*). The two sections work in tandem to put guardrails on the transfer of non-exempt assets into an exempt homestead in the time leading up to a bankruptcy filing, i.e., pre-bankruptcy planning.[33] As the Bankruptcy Appellate Panel for the Tenth Circuit has noted

> The addition of § 522(*o*) to the Bankruptcy Code was "intended to strike a balance between the rights of debtors and creditors in states with unlimited homestead exemptions . . . and to make clear that abusive pre-bankruptcy planning will not be tolerated at the expense of creditors." However, even after BAPCPA's amendments, "[s]ection 522 continues to adopt the position favorably viewed by the Code drafters that the mere conversion of nonexempt property into exempt property, without fraudulent intent, does not deprive the debtor of exemption rights

---

[31] *In re Wayrynen*, 332 B.R. 479, 486 (Bankr. S.D. Fla. 2005) (citing H.R. Rep. No. 190–31, pt. 1, at 102 (2005)).

[32] § 522(*o*). Section 522(*o*) reads:

(*o*) For purposes of subsection (b)(3)(A), and notwithstanding subsection (a), the value of an interest in—
 …
(4) real or personal property that the debtor or a dependent of the debtor claims as a homestead []

shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.

§ 522(*o*). Said another way, "[s]ection 522(*o*) prevents a debtor from claiming a homestead exemption to the extent he acquired the homestead with nonexempt property in the previous 10 years 'with the intent to hinder, delay, or defraud a creditor.'" *Siegel*, 571 U.S. at 424.

[33] *In re Willcut*, 472 B.R. at 93; *In re Coppaken*, 572 B.R. at 302.

in the converted property."[34]

This is another in a long line of cases that raises the thorny issue of conversion of non-exempt assets into exempt property on the eve of bankruptcy in order to take advantage of state-created exemption rights.[35] The two latest opinions from the Court of Appeals for the Tenth Circuit involving pre-bankruptcy planning, *In re Carey* and *In re Warren*, suggest that "something more" than mere placement of assets beyond the reach of creditors—more than the transfer of substantial assets, more than a conversion on the eve of bankruptcy, more than rendering a debtor insolvent, more than the existence of creditors—is required to deny an otherwise valid exemption.[36] As one court summarized the approach currently applied in this Circuit, "pre-bankruptcy planning is not without limits. When there is extrinsic evidence of fraud beyond the act of conversion, or when the act of conversion itself is egregious, a court may find that the debtor acted with the intent to defraud."[37]

---

[34] *In re Willcut*, 472 B.R. at 94 (citations and footnotes omitted).  *See also In re Agnew*, 355 B.R. at 283 ("First, there is nothing in the limited legislative history of BAPCPA to suggest that Congress intended to change the longstanding policy of permitting intentional but nonfraudulent conversion of nonexempt property to exempt property on the eve of filing.").

[35] *In re Mueller*, 867 F.2d 568 (10th Cir. 1989) (purchase of life insurance policy left debtor insolvent); *In re Carey*, 938 F.2d at 1073 (paying down mortgage with non-exempt assets);  *In re Brown*, 108 F.3d at 1290 (granting security interest in auto collection); *In re Warren*, 512 F.3d at 1249 (extensive bankruptcy planning, including sale of coin collection at loss for credit towards new home).

[36] *In re Carey*, 938 F.2d at 1077 ("Although there is substantial evidence in the record of prebankruptcy planning to pay down Carey's mortgage with nonexempt assets, we must accept that actions to 'hinder, delay or defraud a creditor' within 11 U.S.C. § 727(a)(2) *require something more than that*[.]" (emphasis added)); *In re Warren*, 512 F.3d at 1250 (rejecting a finding based on debtor's conversion of assets immediately before the filing of the bankruptcy petition as grounds for denial of discharge under § 727(a)(2)) ("we are most reluctant (for the reasons expressed by Judge Arnold) to recognize a conversion of nonexempt assets to exempt assets as fraudulent" (citing Judge Arnold's dissent in *Tveten*, 848 F.2d at 877 and concurring opinion in *Hanson v. First Nat'l Bank*, 848 F.2d 866, 870 (8th Cir. 1988))).

[37] *In re Beaudin*, 09-35557, 2010 WL 3748735, at *1 (Bankr. D. Colo. Sept. 21, 2010).  *See also Mansell v. Carroll*, 379 F.2d 682, 685 (10th Cir. 1967) ("The homestead exemption is for the benefit of the family and the protection of the family home. It was never intended as a device to

Before we get to the facts of this case, the Court feels the need to address the elephant in the courtroom. *In re Spoor-Weston, Inc.*[38] was decided by this Court in 1992. *Spoor-Weston* is a creature of its time, which predates the amendments made by BAPCPA that added §522(*o*) and (p) to the Bankruptcy Code. The facts of *Spoor-Weston* are fairly straightforward: on advice of counsel, debtors moved substantial cash assets on the eve of filing for bankruptcy primarily to maximize the use of an unlimited homestead exemption under Oklahoma law.[39] The court defined such behavior as "'bankruptcy planning,' whereby debtors deliberately concentrate their wealth in nominally exempt property, to leave as little as possible for distribution to creditors and to secure the full benefit of discharge at a bargain-basement price."[40] Finding that the Bankruptcy Code in effect at that time did not specifically address bankruptcy planning, the court, after a strained reading of legislative history, concluded that all "conversion of non-exempt assets into exempt assets outside the usual course of business and on the eve of bankruptcy ***is wrong***[.]"[41]

While acknowledging that the debtors' exemption rights were a matter of state law, the court in *Spoor-Weston* found that "abuse of an exemption in the context of a bankruptcy" was a matter of bankruptcy law.[42] In the absence of statutory guidance, the court turned to its "equitable

---

effectuate frauds and a court of equity should not countenance any wrongful use of the homestead right.").

[38] *In re Spoor-Weston, Inc.*, 139 B.R. 1009 (Bankr. N.D. Okla. 1992), *aff'd*, No. 92-C-413, slip op. (N.D. Okla. April 13, 1993), *aff'd*, 13 F.3d 407 (10th Cir. 1993).

[39] *Id*. at 1010-12 ("The real problem is debtors' payment of the balance of $21,000 to reduce the mortgage debt on their homestead.").

[40] *Id*. at 1013.

[41] *Id*. at 1015 (emphasis added). To be clear, this was not the prevailing understanding of the Code or the legislative history at that time. *See e.g.*, *In re Carey*, 938 F.2d at 1076 (citing legislative history which states: "As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law." (citations omitted)); *In re Reed*, 700 F.2d 986, 990 (5th Cir. 1983) (same).

[42] *In re Spoor-Weston,* 139 B.R. at 1015-16. *See also id*. at 1013 ("The Oklahoma homestead exemption, 31 O.S. § 1(A)(1), § 2, remains generous and open-ended, and therefore

powers" and "inherent authority" to supply the necessary remedy.[43] Under that framework, the court found that a "strong showing of abuse" would be required "to invoke the court's general equitable powers."[44]  The court then gave a telling example of such abusive behavior: "The classic example would 'have the [debtor]  . . . with guidance from his attorney . . . convert his [non-exempt] assets into cash and then use that cash in such a way as to [shelter] it from his creditors, even while his attorney is busy typing up the bankruptcy schedules.'"[45] In that scenario, the court had no trouble finding that the debtors' pre-bankruptcy conversion of cash into their exempt homestead on the immediate eve of filing, without more, was abusive and sufficient to deny their homestead exemption to the extent of the conversion.

There is a lot to unpack there. First, this Court does not necessarily take issue with the logic or holding of *Spoor-Weston* at the time it was decided, which was affirmed by both the district court and the Court of Appeals for the Tenth Circuit.[46] But after the BAPCPA amendments to the Bankruptcy Code and other recent developments in case law, the Court can no longer rely on its inherent powers to address pre-bankruptcy planning.  As one court noted, the amendments to § 522(*o*) and (p) introduced by BAPCPA made a "significant, if not historical change on the manner in which the pre-filing conversion of non-exempt assets to exemptions . . . must be treated in bankruptcy."[47] Where *Spoor-Weston* found that "[t]he Bankruptcy Code does not deal

---

capable of both good use and great abuse. The Oklahoma Legislature created the exemption, but it is up to the courts to administer it properly.").

[43] *Id*. at 1015 ("The equitable powers of a bankruptcy court, whether codified in 11 U.S.C. § 105 or 'inherent,' may be relied on to supply any remedy necessary or appropriate to carry out the provisions of the Code, and to prevent fraud or injustice and safeguard the public interest.").

[44] *Id*. at 1016.

[45] *Id*.

[46] No. 92-C-413, *slip op.* (N.D. Okla. April 13, 1993); 13 F.3d 407 (10th Cir. 1993).

[47] *In re Anderson*, 386 B.R. at 328. *See also In re Coppaken*, 572 B.R. at 303; *In re Corbett*, 478 B.R. 62, 70 (Bankr. D. Mass. 2012) ("Section 522(*o*) is Congress's means of adjusting the goal posts with respect to pre-bankruptcy exemption planning by balancing the rights of debtors

specifically with 'bankruptcy planning,'" such is no longer the case, at least where the planning involves certain specified property interests, including "real or personal property that the debtor or dependent of the debtor claims as a homestead."[48]  To the extent *Spoor-Weston* applied the court's equitable powers to address abusive pre-bankruptcy planning, those powers must now give way to the language of the statute.[49]  Sections § 522(*o*) and (p) now provide the statutory basis from which to determine whether pre-bankruptcy planning should be limited or considered abusive.

Likewise, the United States Supreme Court, in *Law v. Siegel*, reminds us that, although bankruptcy courts may have statutory authority under § 105(a) and "inherent power . . . to sanction 'abusive litigation practices,'" the exercise of those powers "may not contravene specific statutory provisions."[50] The Court noted that it has long held that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of" the Bankruptcy Code.[51] The holding in *Law v. Siegel* is instructive: despite a clear finding of bad faith and unfair dealing by the debtor, the Court found no solace in § 522.  Finding the debtor was entitled to an exemption under state law, the Court held that unless a limitation on that right was found in the Code or other statute, bankruptcy courts did not possess a "general, equitable power . . . to deny exemptions based on a debtor's bad-faith conduct."[52] Put succinctly: "[F]ederal law provides no authority for bankruptcy courts to deny an exemption on a ground not specified in the Code."[53]

---

and creditors in states with unlimited homestead exemptions and making clear that abusive pre-bankruptcy planning will not be tolerated at the expense of creditors."); *In re Sissom*, 366 B.R. 677, 714 (Bankr. S.D. Tex. 2007) (referring to the enactment of § 522(*o*) as "a sea change with respect to protection of homesteads.").

[48] *In re Spoor-Weston,* 139 B.R. at 1013; § 522(*o*)(4) and (p)(1)(D).

[49] *Law v. Siegel*, 571 U.S. at 415.

[50] *Id*. at 421.

[51] *Id*.

[52] *Id*. at 425.

[53] *Id*.

All of which brings us back to the present case.  For the reasons stated above, *Spoor-Weston* is no longer controlling law in this district; the Court must instead be guided by the statutory framework created by Congress found in § 522(*o*) and (p). Those provisions, working together, create the boundaries within which the Court may consider the manner and extent of allowable pre-bankruptcy planning.

We start with § 522(p), which, on the Petition Date, limited each Debtor to an interest of $189,050 in property acquired within 1215-days.[54]  Although neither party raised the limitation of § 522(p), the Court notes that the Bankruptcy Appellate Panel for the Tenth Circuit has found that section incorporates the terms of § 522(m) to double the exemption limitation in a joint case.[55] Therefore, Debtors' exemption in the Homestead passes its first hurdle.

Next, § 522(*o*)(4) effectively creates a four-part test that requires an exemption to be reduced when 1) the debtor disposed of property within 10 years of the petition date; 2) the property disposed of was not subject to any exemption, i.e., non-exempt; 3) the proceeds of the disposed of property were used to increase the debtor's interest in exempt homestead property, i.e., conversion of non-exempt property into exempt homestead property; and 4) such action was done with the intent to hinder, delay, or defraud creditors.[56] In this case, the first three elements of § 522(*o*) have been met. Within five months of the Petition Date, Mrs. Ashwood received the Goodall Funds and held them in the Chase Account for approximately 20 days before the Homestead Funds were transferred to Titan. At the time of the transfer to the Titan, the Homestead

---

[54] *See supra* note 29 and accompanying text.

[55] *See Dykstra Exterior, Inc. v. Nestlen (In re Nestlen),* 441 B.R. 135 (10th Cir. BAP 2010) (holding that § 522(m) applies to double the exemption cap found in § 522(p) in a joint case as a matter of bankruptcy law). *See also In re Rasmussen,* 349 B.R. at 747 (allowing stacking of exemptions under Florida law); *In re Cook*, 535 B.R. 877, 884 n.48 (Bankr. N.D. Fla. 2013) (same); *In re Rich*, No. 12-10357, 2013 WL 1628723, at *3 (Bankr. D. Kan. Apr. 16, 2013) (Kansas law).

[56] § 522(*o*). *See also Turner v. Keck (In re Keck)*, 363 B.R. 193, 208 (Bankr. D. Kan. 2007).

Funds were a non-exempt asset in the hands of Debtors. The Homestead Funds were used to acquire Debtors' interest in the Homestead. The only remaining question is whether the conversion of the Homestead Funds into the Homestead was done with the intent to hinder, delay, or defraud Debtors' creditors.

Although § 522(*o*) does not provide guidance on what constitutes intent to hinder, delay, or defraud creditors, courts have a long history of interpreting similar language under § 727(a)(2) and § 548(a)(1).[57] When determining whether a transfer was made with the intent to hinder, delay, or defraud creditors, courts must look for "*actual* intent to defraud creditors," in light of the events giving rise to the transfer.[58] A debtor's intent is "measured at the time of disposition of the non-exempt property."[59] Courts consider various "badges of fraud" to determine whether a debtor has acted with the requisite intent to hinder, delay, or defraud a creditor.[60]  Among the badges of fraud often considered by courts in the Tenth Circuit are:

    (1) lack or inadequacy of consideration for transfer;
    (2) existence of a family, friendship, or special relationship between parties;

---

[57] *See In re Anderson*, 386 B.R. at 329; *Addison v. Seaver (In re Addison)*, 540 F.3d 805, 812 (8th Cir. 2008) ("Given the similarity of the language among these statutes, we conclude that the badges of fraud approach should also apply to determine a debtor's intent under § 522(*o*)."); *In re Agnew*, 355 B.R. at 284 ("[T]he case law interpreting the phrase 'intent to hinder, delay, or defraud a creditor' in 727(a)(2)(A) and 548(a)(1), which requires actual intent to defraud, 'provides instructive guidance' when construing the same phrase in 522(*o*)." (citations omitted)); *In re Maronde*, 332 B.R. 593, 599 (Bankr. D. Minn. 2005).

[58] Although § 522(*o*) uses the disjunctive "hinder, delay, or defraud," courts in the Tenth Circuit require a finding of "*actual* intent to defraud creditors" when interpreting that phrase. *In re Carey*, 938 F.2d at 1077; *In re Keck*, 363 B.R. at 208; *In re Agnew*, 355 B.R. at 284. *See also In re Addison*, 540 F.3d at 812 (same result in 8th Circuit).

[59] 4 Collier on Bankruptcy ¶ 522.08 (16th ed. 2025). *See also In re Enloe*, 542 B.R. 414, 428 (Bankr. S.D. Tex. 2015) ("The operative date is not [debtor]'s state of mind as of the petition date, but rather his state of mind when he made the transfers." (citing *Cipolla v. Roberts (In re Cipolla),* 476 Fed. Appx. 301, 306 (5th Cir. 2012))); *In re Booth*, 417 B.R. 820, 823 (Bankr. M.D. Fla. 2009) ("The purchase of the Property is the relevant time period for evaluating the Debtor's intent pursuant to the plain language of 11 U.S.C. Section 522(*o*).").

[60] *See, e.g., In re Brown*, 108 F.3d at 1293-94; *In re Carey*, 938 F.2d at 1077; *Parks v. Anderson*, 406 B.R. 79, 96-97 (D. Kan. 2009).

(3) attempt by debtor to keep transfer secret;
(4) financial condition of the party sought to be charged both before and after transaction;
(5) existence or cumulative effect of pattern or series of transactions or course of conduct after incurrence of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
(6) overall chronology of events and transactions.[61]

In appropriate circumstances, some courts have also considered:

(7) the retention of possession, benefit, or use of the property in question; and
(8) a purported transfer of all or substantially all of the debtor's property.[62]

Cases involving fraudulent intent "are peculiarly fact specific, and the activity in each situation must be viewed individually."[63] Critically, review of the badges is not a math problem: "[C]ourts look to whether the aggregate of facts demonstrates an inference of fraud rather than requiring the plaintiff to show a majority or any specific number of the badges."[64]

Of the enumerated badges, the Court finds they apply to this case as follows:

1. **Was there a lack or inadequacy of consideration for the transfer?**

 No. The transfer of the Homestead Funds to Titan in exchange for the Homestead appears to be an arm's-length transaction with a reasonably equivalent exchange of value. The Homestead Funds equaled approximately $203,000; the Homestead has a scheduled value of $210,000. This badge favors Debtors.

2. **Was property transferred to an insider?**

No. The Homestead Funds were transferred to Titan, which was an unrelated, third-party seller. This badge favors Debtors.

---

[61] *Freelife Int'l, LLC v. Butler (In re Butler)*, 377 B.R. 895, 916-17 (Bankr. D. Utah 2006) (internal citations and footnotes omitted).
[62] *Id.*
[63]  *In re Carey*, 938 F.2d at 1077.
[64]  *Horizon Fin. Bank v. Borstad (In re Borstad)*, 550 B.R. 803, 830 (Bankr. D.N.D. 2016) (citing *Soza v. Hill (In re Soza),* 542 F.3d 1060, 1067 (5th Cir. 2008)).

3. **Was there an attempt by debtor to keep the transfer secret?**

This badge lies at the heart of Trustee's objection.  First, given the language of § 522(*o*), the Court must consider whether Debtors attempted to conceal the disposal of the Homestead Funds at the time they were transferred to Titan.[65] The Goodall Funds were deposited into the Chase Account held in Mrs. Ashwood's name. Trustee has suggested that Debtors purposely chose the Chase Account to receive the Goodall Funds because Mr. Ashwood's name was not on the account, and that this choice was indicative of fraud. There is no evidence Debtors held the Goodall Funds in a manner that shielded the funds from their creditors.[66] Nor does the Court find it remarkable, much less fraudulent, that joint debtors would maintain separate accounts in their individual names. Mrs. Ashwood was personally liable on the debts to both Credit Acceptance Corporation and Discover Bank, which were actively pursuing collection actions against Debtors during this time. There is likewise no evidence Debtors took any action to conceal the purchase of the Homestead from any creditor at the time of the transaction. Debtors were under no obligation to alert creditors to the existence of the Goodall Funds prior to their disbursement for the purchase of the Homestead.[67]

Second, the Court considers whether Debtors' omissions from the original SOFA and at the Meeting of Creditors were made intentionally to conceal the conversion of the Homestead Funds in furtherance of a scheme to defraud creditors. Under the facts of this case, the Court finds

---

[65] *See supra* note 59 and accompanying text.

[66] *See, e.g., In re Elliott*, 544 B.R. 421, 433 (9th Cir. BAP 2016) ("The debtor might be found to have concealed the property if the debtor takes affirmative action to mislead creditors about whether particular property existed."), *aff'd*, 692 Fed. Appx. 472 (9th Cir. 2017).

[67] *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 568 (7th Cir. 1989) ("However, a finding of fraud requires more than a failure to volunteer information."); *Cont'l Bank & Tr. Co. v. Winter*, 153 F.2d 397, 399 (2d Cir. 1946) ("Proof of concealment, however, requires something more than a mere failure to volunteer information to creditors." (citing *In re Shoesmith*, 135 F. 684, 687 (7th Cir. 1905)).

they were not. Both the existence of the Debtors' unencumbered interest in the Homestead and the fact of its recent acquisition were openly disclosed in Debtors' schedules.[68] Based on information found in Debtors' schedules, Trustee was put on sufficient notice to inquire about the circumstances of the acquisition of the Homestead at the Meeting of Creditors, which he did. Trustee suggests that he had to "drag" the truth out of the Debtors; the recording of the meeting reveals a more subtle story. Under questioning, Debtors did not appear to understand the practical difference between a direct gift of real property (which is how they understood the transaction) and a gift of money earmarked for a particular purpose (which is what occurred). Debtors freely provided Trustee with a copy of the deed to the Homestead, showing its recent acquisition, and described the chronology of the gift from Goodall. The Court finds Debtors' responses to Trustee's questions at the Meeting of Creditors were consistent with their unsophisticated lay understanding of the transaction.

Trustee focuses on two questions in the SOFA that he believes Debtors used to actively conceal the conversion of the Homestead Funds. SOFA Question 18 asks whether a debtor *sold, traded, or otherwise transferred any property* within the critical time period. It tells debtors to include outright transfers and the granting of security interests. The question specifically tells debtors to "not include gifts and transfers that you have already listed on this statement."[69] A sophisticated bankruptcy practitioner would understand that the transfer of cash to Titan to *purchase* the Homestead meets the definition of "otherwise transfer any property to anyone." Failure to disclose the transfer under SOFA Question 18 was an indisputable omission. But the Court does not attribute that level of sophistication to these Debtors.

---

[68] Defendants' Ex. 101, at 16-17.
[69] Defendants' Ex. 101, at 41.

Likewise, the Court would expect receipt of the Goodall Funds to appear in response to SOFA Question 5.[70]  Question 5 asks debtors to list "any other income" received in the previous two years, whether or not that income is taxable.[71]  It gives a list of examples of such "other income" including "alimony; child support; Social Security, unemployment, and other public benefit payments; pensions; rental income; interest; dividends; money collected from lawsuits; royalties; and gambling and lottery winnings."[72] Notably, receipt of a gift, whether of money or property, is not in that list. Of course, our sophisticated bankruptcy practitioner will once again recognize that, notwithstanding its absence from the examples listed on the form, a gift is certainly nontaxable income to a debtor and should correctly be disclosed in SOFA Question 5.  But it is a stretch to suggest that unsophisticated lay persons, such as these Debtors, would make that connection, or that failure to do so must automatically lead to a conclusion of fraudulent concealment.

The more concerning omission from the SOFA is the failure to disclose the Chase Account under Question 20. Mrs. Ashwood testified that she had previously used the Chase Account to accumulate and pay her residential rent payments. The account held the Goodall Funds for approximately three weeks between their receipt and the transfer to Titan.  After the purchase of the Homestead, Mrs. Ashwood ceased using the account, and it was closed by Chase for disuse after several months. While the Court finds the failure to disclose the Chase Account was an indisputable omission, it cannot find that it rises to the level of fraud in this case. There is no indication that Debtors had any belief that receipt of the Goodall Funds or the subsequent transfer

---

[70] No party raised the lack of information provided in SOFA Question 5, but, given its obvious application to this case, the Court feels a complete discussion of how such a gift ***should*** be disclosed is warranted.

[71] Defendants' Ex. 101, at 38.

[72] *Id*.

of the Homestead Funds was wrongful.[73] The Debtors' unencumbered interest in the Homestead

itself and its recent acquisition were fully disclosed in the Debtors' schedules. While the Court

cannot condone Debtors' failure to disclose the transfer of the Homestead Funds or the Chase

Account, neither can the Court find the omissions were purposely done to conceal malfeasance

from the Trustee. Debtors correctly remedied each of these omissions when they later amended

their SOFA.[74] Under the facts of this case, the Court finds these omissions were either inadvertent

or based on a lay misunderstanding of what needed to be disclosed.  Accordingly, the Court does

not find sufficient evidence Debtors tried to conceal the use of the Homestead Funds from

Trustee.[75] This badge favors Debtors.

4. **What was the financial condition of the debtors both before and after the transaction?**

In applying this badge, the Court starts with the presumption that a debtor's insolvency,

without more, will not support a finding of fraudulent intent because "a debtor converting

nonexempt property to exempt property 'on the eve of bankruptcy' will almost always be

insolvent."[76] Prior to receipt of the Goodall Funds, Mrs. Ashwood testified that Debtors were

---

[73] Other than the timing in the months prior to the Petition Date, the Court likewise cannot find that the transfer was wrongful.

[74] Defendant's Ex. 104. Notably, at the Hearing, counsel for debtors did not offer "forgetfulness" or "misunderstanding" as reasons for the omissions, but instead took the position that once the interest in the Homestead was declared in the schedules, no further disclosure of any transactions on the SOFA was required.  She went so far as to suggest the amendments made to the SOFA were not required, but were made simply to appease the Trustee.  As noted by the Court at the Hearing, this attitude is deeply troubling.  For the reasons stated *supra*, each step in the transaction, from receipt of the Goodall Funds, to holding them in the Chase Account, to the transfer to Titan, should have been disclosed in the SOFA.  *See In re Garland*, 417 B.R. 805, 815–16 (10th Cir. BAP 2009) (emphasizing the importance of full disclosure for the proper functioning of the bankruptcy system).  But counsel's statements add further support to the Court's conclusion that the omissions from the SOFA were not intentionally or fraudulently made by Debtors to conceal the transaction from the Trustee.

[75] *See In re Brown*, 108 F.3d at 1294 ("[W]e must not penalize the debtor for an inadvertent mistake.").

[76] *In re Addison*, 540 F.3d at 815 n.12.

struggling financially and had actively considered bankruptcy relief. They had no non-exempt assets that could have been used to satisfy their debts. After the Goodall Funds came under Debtors' control, they were temporarily solvent because they possessed liquid assets that exceeded their current debts. After the purchase of the Homestead, Debtors were once again insolvent, as that term is defined in the Bankruptcy Code.[77] The receipt of the Goodall Funds was clearly a windfall to Debtors that improved their financial condition. The subsequent conversion of those funds from non-exempt to exempt property, which is the focus of § 522(*o*), had the effect of making Debtors once again insolvent. They were only solvent for a period of approximately three weeks and only because it was necessary to effectuate Goodall's gift.  The Court finds it significant that the Goodall Funds, although not legally restricted under the terms of the gift, were intended by Goodall to be used for the purchase of the Homestead.  Debtors' creditors were in no worse position after the purchase of the Homestead than they were prior to Debtors' receipt of the Goodall Funds. The Court does not find this temporary change in Debtors' financial circumstances to indicate any fraudulent intent on behalf of the Debtors.  This badge favors Debtors.

5. **Was there a pattern or series of transactions or course of conduct after incurrence of debt, onset of financial difficulties, or pendency or threat of suits by creditors?**

No. Debtors have not engaged in a "pattern or series of transactions." They received a large one-time gift from a family member and converted the bulk of that gift into an exempt asset shortly thereafter, consistent with the intended purpose of the gift. The remainder of the gift was spent on

---

[77] Section 101(32) provides that a person, is insolvent when

the sum of such [person's] debts is greater than all of such entity's property, at a fair valuation, exclusive of—(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and (ii) **property that may be exempted from property of the estate under section 522 of this title**[.]

§ 101(32) (emphasis added).

daily living expenses.  There is no evidence Debtors took any action to mislead creditors or delay any collection action.[78] Mrs. Ashwood testified that after the purchase of the Homestead, Debtors had hoped to begin repaying creditors and avoid filing for bankruptcy. Unfortunately, they were unable to do so.  This badge favors Debtors.

6. **What is the overall chronology of events and transactions?**

At a time when Debtors were struggling financially, Goodall decided to help them by making a gift in the form of a house. Debtors selected a house. Goodall attempted to purchase that house, was thwarted, and instead decided to transfer the Goodall Funds directly to Debtors so that they could buy the house. At the time, Debtors were actively being pursued by judgment creditors. Despite this, Debtors used the bulk of the Goodall Funds to purchase the Homestead. Five months after the purchase of the Homestead, Debtors found their financial condition largely unchanged, and they decided to seek bankruptcy relief. This is not a case where Debtors scrambled to shelter assets that otherwise could not have been protected from creditors. The Court finds no indicia of fraud in this chronology of events. This badge favors Debtors.

7. **Did debtors retain possession, benefit, or use of the converted property?**

No. This badge considers whether a debtor purports to convert a non-exempt asset, yet retains an interest in the non-exempt asset after the conversion.[79] The transfer of property "to family members and at the same time retaining the use and enjoyment of that property" has been described as a "classic badge of fraud."[80]  For example, in *In re Cadarette*, the debtor made a gift

---

[78] Mrs. Ashwood testified that she did not use any of the Goodall Funds to make payments on her car loan, despite assurances to Goodall that she had done so.  Because there is no evidence that Goodall was a creditor of Debtors, the Court does not find this deception relevant.

[79] *See e.g., EFA Acceptance Corp. v. Cadarette (In re Cadarette)*, 601 F.2d 648, 651 (2d Cir. 1979).

[80] *Hanson v. First Nat. Bank in Brookings*, 848 F.2d 866, 869 (8th Cir. 1988).

of a car, boat, and trailer to his fiancé for no consideration immediately before filing bankruptcy, but evidence showed that all of the property remained in the debtor's backyard and he continued to use it as he had prior to the "gift."[81] The court found "[t]he retention of the use *of transferred property* very strongly indicates a fraudulent motive underlying the transfer."[82] This badge will indicate fraud when a debtor transfers an asset for less than fair consideration or to an insider, such that they maintain control of the asset in the future.  This badge does not implicate an arm's-length transaction where a debtor relinquishes control of a non-exempt asset in exchange for an exempt asset of equal value.[83]

Here, Debtors had possession of a cash asset, the Homestead Funds, which they exchanged for the Homestead in an arm's-length transaction. There has been no allegation that Debtors retained the benefit and use of the cash after the transfer or that the transaction was conducted through an insider. This badge favors Debtors.

8. **Did debtors transfer all or substantially all of their property?**

Yes. Once the Goodall Funds were deposited in the Chase Account, those funds legally became a non-exempt asset under the control of Debtors. The Homestead Funds comprised almost all of the Goodall Funds. Debtors had no other unencumbered property or assets. Relying on

---

[81] *In re Cadarette*, 601 F.2d 648, 651 (2d Cir. 1979) (emphasis added).

[82] *Id*.

[83] *See In re Brown*, 108 F.3d at 1293 (finding debtor's retention of property after granting a security interest in an arm's-length transaction did not indicate fraud); *In re Carey*, 938 F.2d at 1078 ("Carey retained no beneficial interest *in any converted property*." (emphasis added)); *In re Elholm*, 80 B.R. 964, 969 (Bankr. D. Minn. 1987) ("Standing alone, to be sure, Debtor's decision to convey the properties does not bespeak an intent either to put the value of those assets beyond the reach of his creditors, or to hinder or delay his creditors or bankruptcy trustee. *Neither, really, would a consummation of that decision via an arms-length sale of these property interests to an independent third-party purchaser*." (emphasis added) (fraudulent intent found where debtor sold real property to wife and sons for below market prices allowing him to retain possession and ownership of the transferred property within his family)).

*Spoor-Weston*, Trustee argues that the conversion of non-exempt assets into exempt assets outside the usual course of business and on the eve of bankruptcy, is itself wrongful. On that basis, this badge appears to favor Trustee.

However, this conclusion gives insufficient consideration to the general principle, noted *supra*, that "the conversion of non-exempt to exempt property for the purpose of placing the property out of the reach of creditors, without more, will not deprive the debtor of the exemption to which he otherwise would be entitled."[84] Prior to BAPCPA, in jurisdictions with unlimited homestead exemptions, courts attempted to create *judicial* guardrails on those exemptions by finding fraud when debtors made abusive or excessive use of the exemptions.[85] As summarized by one court:

> The difference, which seems initially to be one merely of degree, at some point as yet unspecified becomes a difference in kind which requires a different result. This same principle was succinctly stated by Judge Logan in *Dolese v. United States of America*, 605 F.2d 1146, 1154 (10th Cir. 1979), "There is a principle of too much; phrased colloquially, when a pig becomes a hog it is slaughtered." That principle fully applies here. While a bankrupt is entitled to adjust his affairs so that some planning of one's exemptions under bankruptcy is permitted, a wholesale sheltering of assets which otherwise would go to creditors is not permissible.[86]

The introduction of § 522(p) now places *statutory* guardrails on the amount of pre-bankruptcy conversions, obviating the need for continued reliance on pre-BAPCPA *judicial* guardrails.

---

[84] *See supra* note 27 and accompanying text.

[85] *See e.g., Tveten*, 848 F.2d at 873–74 ("[T]he state exemption relied on by [debtor] was unlimited, with the potential for unlimited abuse."); *Matter of Bowyer*, 916 F.2d 1056, 1060 (5th Cir. 1990) ("This analysis recognizes that while some pre-bankruptcy planning is appropriate, the wholesale expenditure of non-exempt assets on the eve of bankruptcy, including conversion to exempt assets (especially where there are liberal state law exemptions), may not be."), *rev'd on reh'g*, 932 F.2d 1100 (5th Cir. 1991); *In re Zouhar*, 10 B.R. 154, 157 (Bankr. D.N.M. 1981) ("The vastly enhanced potential for exemptions in New Mexico obviously presents the potential for abuse of legitimate exemptions." (noting that New Mexico statutes permit unlimited exemptions with respect to insurance, and pension and retirement plans)).

[86] *In re Zouhar*, 10 B.R. at 157.

Debtors are permitted to transfer funds from a non-exempt asset into homestead equity so long as it does not exceed the statutory limit and is not done with fraudulent intent.[87]  In this case, although the purchase of the Homestead involved a conversion of $203,520.28, that amount was well within the statutory limits of § 522(p) for debtors in a joint bankruptcy case.  In the absence of other indicia, the Court will not find fraud solely based on the dollar amount transferred, as long as it is within the statutory boundaries.  The Court concludes this badge favors Debtors.

So ends our walk through the badges of fraud. Based on the above factors, the Court concludes that Debtors did not convert the non-exempt Homestead Funds with the intent to hinder, delay, or defraud creditors. Any indicia of fraudulent intent stemming from the badges is *de minimis* in light of the absence of extrinsic evidence of fraud. Here, Debtors received a large windfall on the eve of bankruptcy in the form of a cash gift from Goodall to be used to purchase the Homestead. There was no indication the gift from Goodall was anything but gratuitous and intended to help Debtors in a time of financial need. While no legal or contractual strings were attached to the Goodall Funds, Debtors felt a moral obligation to use the funds for their intended purpose. The Goodall Funds were openly placed in an existing checking account in Mrs. Ashwood's name.[88] There was no sharp dealing by Debtors and no effort to conceal the Goodall Funds from creditors while they were in the Debtors' possession.  The Homestead Funds were then used in accordance with Goodall's intent to help Debtors purchase the Homestead. Creditors were in no worse position after the purchase of the Homestead than they had been immediately before the Goodall Funds were received. Under these unique facts, the Court finds the Trustee has not

---

[87] § 522 (*o*) & (p); *Parks v. Anderson*, 406 B.R. at 95; *In re Willcut*, 472 B.R. at 96–97.

[88] Because Mrs. Ashwood was a judgment debtor of both Credit Acceptance Corporation and Discover Bank, the Court finds the use of a non-joint account to hold the Goodall Funds is of no consequence.  *See supra* note 67.

met his burden under § 522(*o*).

## Conclusion

The Court concludes that Trustee has not met his burden to show intent to hinder, delay, or defraud a creditor at the time the Debtors disposed of the Homestead Funds to acquire the Homestead. Therefore, Trustee's Objection under § 522(*o*) is OVERRULED.

Dated this 30th day of September, 2025.


BY THE COURT:


PAUL R. THOMAS, CHIEF JUDGE
UNITED STATES BANKRUPTCY

8066.10